John Stephen GILREATH, Petitioner,

v.

A. T. ROBINSON, Superintendent, Virginia State Penitentiary, Respondent.

Civ. A. No. 77–0652–R.

United States District Court,
E. D. Virginia, Richmond Division.

July 30, 1982.

Gilbert K. Davis, McLean, Va., for petitioner.

Thomas D. Bagwell, Asst. Atty. Gen. of Va., Richmond, Va., for respondent.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, an inmate at the Virginia State Penitentiary, brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, attacking the validity of his convictions in a Virginia circuit court of first degree murder and abduction with intent to defile. Petitioner is presently serving concurrent sentences of life and fifty years imposed by a jury upon the two convictions. Three trial errors are alleged by petitioner to have violated his rights under the Fifth, Sixth, and Fourteenth Amendments. First, petitioner contends that his confessions to the crimes charged were involuntary and thus improperly admitted into evidence at trial. Second, petitioner argues that the state court failed to instruct the jury properly concerning the essential elements of first degree murder by imprisonment under Va. Code § 18.1–21. Third, petitioner alleges

that the court's refusal to grant a bifurcated trial for the presentation of an insanity defense and an alibi defense violated his due process rights.

The facts surrounding the instant petition are as follows:

On the morning of October 30, 1973, the body of a fourteen year old girl at the Madeira School in Greenway, Virginia, was found on the school grounds, tied to a tree, and nude from the waist down. The girl's death was diagnosed as resulting from shock and exposure. The Fairfax County police considered petitioner, John Gilreath, their prime suspect due to his conviction two years earlier for sexual assault perpetrated at the school. Although petitioner had received a sentence of twenty years for the earlier conviction, his sentence was suspended and petitioner was allowed instead to receive treatment at the Washington Psychiatric Institute in Washington, D. C. Three months prior to the October 30, 1973 incident, petitioner had been released from the Washington Psychiatric Institute on an out-patient basis.

On the evening of October 30, 1973, two detectives from the Fairfax County Police Department arrived at petitioner's apartment in Washington, D. C. Finding no-one there, the detectives, with the assistance of a D. C. police officer, entered petitioner's apartment and conducted a brief inspection. The two detectives returned to the apartment at 8:30 p. m. that same night and questioned petitioner for approximately one-half hour concerning his whereabouts on October 28 and 29. At 9:00 o'clock p. m., the detectives asked petitioner to accompany them to a nearby D. C. police substation for further questioning.

Once at the police station, the detectives resumed the questioning of petitioner's activities on October 28 and 29. Petitioner repeated his account of his activities on those days several times, asserting that he was either in Washington or in Manassas, Virginia, but not at Madeira School. The detectives read petitioner the warnings required by *Miranda v. Arizona*, 384 U.S. 436,

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at approximately 9:50 o'clock p. m. and secured his signature to a waiver of rights card. At this point, petitioner was informed that the girl at Madeira had died, and that the police found the case very similar to the incident in 1971 involving sexual assault by petitioner. Petitioner became very upset at this point and protested that he didn't kill the girl in 1971. The detectives continued to interrogate petitioner until approximately 12:15 o'clock a. m., at which time they returned him to his apartment. Before returning to Fairfax County, the detectives searched petitioner's car with his permission. Petitioner agreed that he would go to the Fairfax County Police Station the next day at 2:00 o'clock p. m. for further questioning.

On the morning of October 31, after what petitioner understandably described as a restless night, he attempted to contact his probation officer, Carol Riesenman. Before visiting the office, however, petitioner stopped by the Washington Psychiatric Institute and spoke with a nurse who had worked closely with him in therapy sessions. She suggested that he return at 10:45 o'clock a. m. to see Dr. Wadeson, petitioner's treating psychiatrist. Petitioner then drove to the probation office and, unable to find Carol Riesenman, spoke with Paul Folliard, his former probation officer. Folliard had already been contacted by the Fairfax County police and was well apprised of petitioner's situation. After listening to petitioner's protestations of his innocence, Folliard urged him to go to the Fairfax County Police and clear himself. Petitioner then returned to the Washington Psychiatric Institute and professed his innocence to Dr. Wadeson, who also urged him to cooperate with the police. Petitioner then drove to the Fairfax Police Station and arrived at noon, two hours earlier than expected.

Prior to petitioner's arrival, the two detectives had been discussing the case and petitioner's account of his whereabouts on October 28 and 29. Upon petitioner's arrival, the detectives escorted him to an interview room and again read petitioner his *Miranda* rights and secured his signature to a waiver of rights form. Petitioner was questioned further about his activities on the two days in issue, during which questioning he was shown black and white pictures of the girl's body. Throughout this interrogation, petitioner continued to deny any involvement with the girl's death at Madeira. At some time during this interrogation, petitioner was brought lunch. At approximately 3:30 o'clock p. m., apparently frustrated by the detectives' suggestion that he was responsible for the girl's death, petitioner requested that he be allowed to take a polygraph test.

Petitioner was escorted to the polygraph examiner at approximately 3:45 o'clock p. m. Between 3:45 o'clock p. m. and 7:45 o'clock p. m., after securing petitioner's signature to a waiver of rights form, the polygraph examiner administered three separate tests to him. The results of those tests and petitioner's responses made between tests indicated that he was not being truthful with the police. The examiner informed petitioner that he felt that the latter was not telling the truth and urged him to do so.

After the polygraph examination, the two investigating detectives resumed their questioning at approximately 8:00 o'clock p. m. Prior to the questioning, however, the detectives attempted to readvise petitioner of his *Miranda* rights, at which point petitioner cut them off, saying, "Never mind, I understand my rights, you have gone through that twice already." The detectives then proceeded to report the polygraph examiner's findings to petitioner. One detective questioned petitioner at one point, "John, what the hell is going through your mind at this time?" Petitioner replied, "I know I did it, you know I did it, it's an open and shut case." Petitioner then gave a verbal confession to the two detectives. A stenographer and another detective were then summoned to take a formal written statement from petitioner. This statement took from approximately 9:05 o'clock p. m. until 10:30 p. m. to complete. Petitioner later reviewed a typed version of his statement and made and initialed several corrections. Following a formal booking

of petitioner on the charges of murder and abduction, the police took him to Madeira School where he re-enacted the crime. He was then returned to the police station where he signed his written confession sometime after 5:00 o'clock a. m. When visited the next day by his probation officers, petitioner repeated his confession to them.

Prior to petitioner's trial, a hearing was held at which petitioner, by counsel, sought to suppress his confessions, both verbal and written. Petitioner presented evidence purportedly showing that on the days during which he was being questioned, he was experiencing a psychotic episode consistent with his latent schizophrenia. During this episode, petitioner claims he was so vulnerable to suggestion and fantasy that he confessed to the crime against his will in order to please his interrogators.

At the conclusion of testimony and argument in petitioner's suppression hearing, the trial court denied the motion to suppress, finding petitioner's confessions to have been voluntary and uncoerced by improper inducement, threats, or promises. The prosecution then proceeded to present its case against petitioner to the jury. The state's theory of the case under the murder charge was reflected in the following jury instruction:

The Court instructs the jury that even though you may believe from the evidence that the defendant did not intend to kill the deceased, if you believe further from the evidence beyond a reasonable doubt that Natalia Semler died as a result of imprisonment by the defendant as imprisonment is defined in another instruction of the Court, then you shall find the defendant guilty of murder in the first degree. . . .

Petitioner unsuccessfully objected to this theory on the ground that the offense of murder by imprisonment required a showing of malice aforethought and foreseeability. Petitioner also sought to obtain a bifurcated trial whereby if guilt were proven to a jury, a second trial would be held on the issue of defendant's sanity. Finding no

provision for such a procedure in Virginia law, the trial court denied this request.

Petitioner was subsequently convicted to first degree murder and abduction with intent to defile. By order of March 24, 1975, the Supreme Court of Virginia affirmed the conviction. The Court finds that petitioner has exhausted his state remedies as to the claims contained in his petition for writ of habeas corpus. The instant petition was filed on November 4, 1977, and was supplemented on March 19, 1980, by substituted counsel. Respondent has moved both to dismiss the petition and for summary judgment on the merits, to which petitioner has failed to respond. Neither party has requested a hearing in this matter, choosing instead to allow the Court to base its decision on the state court record. The Court finds the instant petition now ripe for disposition.

Petitioner's first claim for relief involves the introduction of his verbal and written confessions into evidence at trial. Petitioner argues that the state court's finding that he voluntarily relinquished his Fifth and Sixth Amendment rights when he confessed to the crimes was flawed because the court did not resolve certain factual discrepancies in the testimony at the suppression hearing. Petitioner urges this Court to make an independent ruling on whether the state bore its heavy burdens of proving the voluntariness of the confessions admitted into evidence.

The Court notes that there is no contention that petitioner was not properly advised of his rights under *Miranda, supra*. The two investigating detectives were, if anything, overly cautious in reading petitioner his rights as soon and as frequently as they did on the night of October 30 and on the day of October 31. Indeed, by the night of October 31, petitioner was so well informed that he cut the detective off during a reading of *Miranda* rights, protesting that it was unnecessary. Similarly, the probation officers interrupted petitioner during his spontaneous confession to readvise him of his Fifth and Sixth Amendment rights.

Petitioner argues that while he was adequately informed of his rights, he did not voluntarily and knowingly waive those rights in making his confessions.

▮ Petitioner argues that coercion should have been found in the alleged fact that he was suffering from a psychotic episode, that his interrogators were aware of and exploited his psychological disorders, and that the confession itself was obviously a product of suggestion rather than recollection. Petitioner argues that under *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), this Court may make factual findings independent of the state court's findings in determining the voluntariness of his confession. In this regard, petitioner is only partially correct. While the Supreme Court of the United States in *Brewer* held that the existence of a waiver of rights is a matter of federal law and not of historical fact, the state court's factual findings in support of its ruling must be accorded a presumption of correctness under the principles of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as codified in 28 U.S.C. § 2254(d). Because of the material facts relevant to voluntariness were developed at a full and fair hearing, this Court may substitute its own findings of fact only upon a showing that the state court's determinations are "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). In the event that material factual disputes were not resolved by the state court, then of course this Court may resolve them here. This Court's central role on habeas corpus review, however, is to ensure that proper constitutional standards were applied to the facts as found by the state court.

▮ Though the Court, at petitioner's insistence, granted a plenary hearing, the Court, for the reasons which follow finds that both the state court record and the record in this court supports the state court's factual findings and that the state court adequately resolved the material factual disputes raised by the evidence at the suppression hearing. First, with regard to petitioner's claim that his alleged psychotic state rendered him a puppet in the hands of the police, the trial court found that petitioner went to and talked to the police on October 31, not from coercion, but out of a desire to clear himself if he could. The record amply supports his finding. Indeed, except for Dr. Wadeson's post hoc diagnosis of the psychotic episode, which the trial court discredited in its findings, the weight of the evidence compelled a finding that petitioner was rational, alert, and for the most part, calm and deliberate in his actions. Second, with regard to petitioner's claim that the police employed psychological coercion to exploit his disoriented mental state, the trial court found that no threats were made and that no improper promises or inducements were offered him. Both the prosecution's and petitioner's evidence supported this finding. The only encouragement given to petitioner to speak truthfully was the detective's and polygraph examiner's assertions that they did not believe petitioner. No evidence was presented of threats of punishment or promises of leniency which are the characteristic elements of coercion. Third, with regard to petitioner's assertion that his confession was simply a parroting of a suggested version given by the detectives, the trial court found that the formal statement was too thorough a narrative to have been the product of suggestion. Indeed, as is well supported by the testimony, the court found that petitioner's statements contained facts known "only to the accused himself for the only other witness to the crime with which he is charged is no longer of this world." The detectives' uncontradicted testimony established that petitioner supplied facts which had not been given him independently, and other which were unknown at that time even to the police. Petitioner has made an adequate showing that the record fails to fairly support the state court's findings. At best, petitioner has shown not that the state court failed to resolve factual disputes, but that the court simply resolved them adversely to petitioner.

It is equally clear to this Court that the state court applied proper constitutional

standards to the historical facts. But because no deference is necessarily due the state court's application of federal law, this Court must undertake such a task here. Petitioner argues that the duration of the police interrogation and the detectives' constant assertion that petitioner lying, when coupled with petitioner's alleged psychotic state of mind, constituted coercion prohibited by the Fifth Amendment. After consideration of the totality of the circumstances surrounding petitioner's confessions, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the Court finds that petitioner's will was not overborne by the police interrogation procedures and that petitioner's confessions were the product of a practical realization that his guilt would ultimately be proven.

The main thrust of petitioner's challenge to the state court's finding of voluntariness is not that the police employed patently coercive means of interrogation with petitioner, but that the methods used had a coercive effect due to petitioner's psychological disorientation. Petitioner compares his case to *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), wherein the Supreme Court held involuntary a confession given by a mental hospital patient (classified as 100% incompetent) after eight or nine hours of interrogation in a room about six by eight feet and occupied by a large number of police officers. In *Blackburn*, the Supreme Court reiterated that, in addition to the rack and the thumbscrew, "[a] prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of his friends and relatives is not infrequently an effective technique of terror." *Id.*, 361 U.S. at 206, 80 S.Ct. at 279. The Supreme Court concluded that the compelling evidence of the strong probability that Blackburn was insane at the time he gave his confession required a finding of involuntariness.

Petitioner's case is factually dissimilar to *Blackburn*. Petitioner was not subjected to the isolation found in *Blackburn*. Indeed, petitioner was permitted to spend the night of October 30 in his apartment and was requested to return to the police station the following day at 2:00 o'clock p. m. Further, there is not even the suggestion that petitioner was ignorant of his rights. In fact, petitioner conceded at the suppression hearing that he had understood his rights completely and that he waived them out of a desire not to appear guilty. While there was compelling evidence of insanity in *Blackburn*, the paucity of such evidence in the instant case amply supports the trial court's finding that petitioner did not experience a psychotic episode.

■ This Court must, as it must with juveniles, scrutinize with special care a confession of an allegedly insane person, *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), and with those of low mentality, *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). This task must begin with a presumption against waiver of constitutional rights, to be overcome only by a strong showing of an informed and volitional relinquishment by petitioner of his rights. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). After close scrutiny of the circumstances surrounding petitioner's confession, the Court finds that the state bore its heavy burden of proving that petitioner voluntarily and knowingly waived his rights to remain silent and to counsel. Critical to this determination are the trial court's findings, supported by the record, that petitioner did not suffer a psychotic episode, that no threats or promises were made to him, that he was lucid and alert throughout the interrogation, that he understood his rights, and that he cooperated with the police first out of a belief that he could somehow exonerate himself, and finally out of a realization that he could not. As heretofore noted, the Court finds no reason to upset these findings on habeas corpus review.

Petitioner's involuntariness claim is based in the end upon speculation that a person with prior mental disorders *must* have experienced psychological coercion before confessing to a crime. Such speculation was,

for the most part, unsupported by credible evidence. The presumption against waiver was adequately overcome by the state's showing, both from its own and from petitioner's witnesses, of the existence of signed waivers, of petitioner's intelligence and alertness, and of his affirmation that he understood his rights. *See Moore v. Ballone*, 488 F.Supp. 798 (E.D.Va.1980).

Petitioner's second claim for habeas corpus relief involves the above-quoted jury instruction concerning the elements of the crime of murder by imprisonment. The murder statute in Virginia at the time of petitioner's conviction provided as follows:

> Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit abduction as defined in § 18.1–38, arson, rape, robbery or burglary is murder of the first degree. All other murder is murder of the second degree.

Va.Code § 18.1–21 (1950). The prosecution's theory of the case, as reflected in its proposed jury instruction on murder by imprisonment, was that petitioner could be found guilty of first degree murder, regardless of his intent, if the victim died as a result of the imprisonment. Petitioner argues that some intent to kill was required for a conviction under this statute and that the court's instruction, without reference to intent, resulted in constitutional error.

■ The standard for habeas corpus review of a challenged jury instruction in a state trial resulting in a conviction is set out in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Before this Court can overturn petitioner's conviction, it must be established not only the instruction is erroneous or otherwise undesirable, but that it violates some constitutional right guaranteed to petitioner. *Id.* at 146, 94 S.Ct. at 400. The Court is unable to discern any constitutional inadequacy in the challenged instruction, however, because it finds the instruction a fair and accurate explanation of Virginia law on murder by imprisonment. *See Reeves v. Reed*, 596 F.2d 628, 630 (4th Cir. 1979). The earliest

discussion, by Virginia's highest court, of the intent and premeditation required for conviction of murder by imprisonment, was found in *Commonwealth v. Jones*, 28 Va. (1 Leigh) 598 (1829). The Virginia Court of Appeals in that instance held that "imprisonment" as used in a predecessor statute to that in the instant case "may be with a view to reduce the victim to the necessity of yielding to some proposed conditions, as well as a punishment for the failure of prompt obedience, without any certain and final determination to destroy life." *Id.* at 611. In cases of imprisonment, as with poisoning and the other enumerated actions, the court was of the view that the underlying legislative intent was to hold the perpetrator guilty of first degree murder "without further proof that the death was the ultimate result, which the will, deliberation and premeditation of the party accused sought." *Id.; see Howell v. Commonwealth*, 67 Va. (26 Gratt.) 995, 997 (1875). The trial court thus was correct in instructing the jury in the aforementioned manner regarding murder by imprisonment. No federal constitutional right was thereby deprived. *See Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960).

■ Petitioner's third and final claim for relief involves the trial court's refusal to bifurcate petitioner's trial so as to facilitate separate trials on the issues of causation and insanity. Petitioner argues that his due process rights were compromised by having to present the two inconsistent defenses of alibi and insanity to the same jury.

Petitioner has failed to satisfy the Court how the lack of such a split-trial procedure in Virginia courts has deprived him of any constitutional right. The decision of which defenses to present to a jury in a criminal trial is properly left to the judgment and wisdom of the criminal defendant and his attorney. The due process clause of the Fourteenth Amendment does not guarantee one charged with a crime a separate audience for each and every defense he or his counsel may devise. As with many other decisions made prior to and during trial, a

wrong choice of defenses may have severe adverse consequences. However, due process is not implicated simply by the fact that such a choice is foisted upon the criminal defendant. Provision of such split-level procedures is a matter of state law and cannot serve here as the basis for habeas corpus relief. *Cf. Chance v. Garrison*, 537 F.2d 1212, 1215 (4th Cir. 1976); *Grundler v. North Carolina, supra.*

Finding no constitutional error in petitioner's state convictions, the Court must deny the writ of habeas corpus.

An appropriate order shall issue.