**Raymond BARNES, Petitioner,**

v.

**Robert HENDERSON, Warden, Auburn Correctional Facility, State of New York, Defendant.**

**No. CV–87–3085.**

United States District Court,
E.D. New York.

Nov. 15, 1989.

Eric M. Alderman, Syracuse, N.Y., for petitioner.

Ray F. Cerreta, Asst. Dist. Atty., Kew Gardens, N.Y., for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Petitioner Raymond Barnes, an inmate at Auburn Correctional Facility in Auburn, New York, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On November 2, 1978, after a jury trial in Supreme Court, Queens County, petitioner was convicted of second degree murder (felony murder) and first degree robbery and was sentenced to concurrent prison terms of 25 years to life on the murder conviction, and 8½ to 25 years on the robbery conviction. On December 31, 1981, the Appellate Division affirmed the conviction without opinion, *People v. Barnes*, 85 A.D.2d 737, 449 N.Y.S.2d 646 (2d Dept.1981) and on June 3, 1982 the New York State Court of Appeals denied leave to appeal. *People v. Barnes*, 56 N.Y.2d 1034, 453 N.Y.S.2d 1030, 439 N.E.2d 404 (1981).

In October 1983, Barnes moved to vacate his judgment of conviction pursuant to N.Y.Crim.Proc.Law § 440.10 (McKinney 1983 & Supp.1988). That motion was denied by the New York Supreme Court, Queens County on February 23, 1984. *People v. Barnes*, 123 Misc.2d 142, 472 N.Y.S.2d 1017.

On July 9, 1987, Barnes filed a petition for federal habeas corpus relief in the United States District Court for the Northern District of New York. On August 18, 1987, the petition was transferred to the Southern District of New York. On August 26, 1987, it was transferred again to this court.

Petitioner asserts two grounds for habeas relief:

(1) The trial court erred in admitting the trial testimony of the sole eyewitness, who had been hypnotized, thereby violating

 (a) petitioner's Sixth Amendment right to effective assistance of counsel because there was no defense counsel present during the hypnosis session,

 (b) petitioner's Sixth Amendment rights to be confronted with the witnesses against him and to the effective assistance of counsel because the hypnosis made cross-examination of the eyewitness impossible.

(2) The trial court erred in admitting testimony concerning a photo-identification, because it was tainted by the allegedly suggestive hypnosis procedure.

## FACTS

Between 11 a.m. and noon on Saturday, November 13, 1976, Thomas Morton met Acey King. After driving around for some time, Morton and King went to the Show Spot Bar on Main Street in Flushing, New York (93–95, 109–115, 132).[1] Upon leaving the bar with King, Morton saw petitioner and Curtis Griffin standing across the street at a bus stop. Petitioner called to them and asked for a ride to Bayside. Petitioner and Griffin then got into the back seat of King's car.

While still in Flushing, petitioner told King to stop the car so he could get some beer. At approximately 8 p.m., petitioner and Curtis Griffin entered Thomas Pennolino's grocery store, pulled out shotguns and demanded money from Pennolino (24–27, 37–39, 45–46, 80).

Jerry Licatesi, Pennolino's nephew, was working in the store that night. Petitioner pointed a shotgun at Licatesi's chest and directed him to lie on the floor. Licatesi complied, but continued to watch the robbers (27–29, 44–49, 54–55, 88). After Pennolino surrendered the money in the cash register, the robbers asked for money from his pockets. When Pennolino responded that he had no other money, petitioner shot Pennolino in the chest and took money from his pockets (29–32, 49, 88–89). Licatesi then hid behind a Coca–Cola stand and watched petitioner and Griffin leave. The entire incident lasted for approximately five to ten minutes (31–32, 44, 88–89). Pennolino died from the gunshot wound (292–93, 263–269).

On the night of the shooting, Licatesi described the triggerman to Detective Michael Walsh, who wrote down the following description: "Male black, six foot one, white ski hat, armed shotgun, leather jacket, thin, nineteen to twenty-one years, light chin whiskers." (H 104–107).

On February 1, 1977, Licatesi, the sole eyewitness, underwent hypnosis in order to refresh his memory of the crime. The hypnosis session lasted approximately one-half hour and was conducted at police head-quarters by two Police Department hypnotists, Sergeants Diggit and McGrath. Detective Walsh also was present during the hypnosis (298–299). The hypnosis session was recorded on voice tape (358; Ex. M). However, most of the tape is inaudible (369).

Detective Walsh testified at trial that the hypnotist told Licatesi that he was going to "plant a very powerful suggestion in his mind." (375). However, the only additional detail Walsh recalled Licatesi giving under hypnosis was that at one point, Griffin had placed his shotgun down alongside the register (H 64–69; 103–104, 107–109). Walsh also testified that after the session the police did not ask Licatesi for any additional descriptions of the triggerman.

On March 4, 1977, Licatesi was taken to Police Headquarters in Nassau County where he was shown a series of fourteen color slide photographs, accompanied by a voice tape of each person appearing in the slides. (H 115, 118–119, 120, 122). Walsh testified that no one suggested which photograph to select, either directly or by signals, or said anything to Licatesi as the slides were shown (H 128). Licatesi identified the petitioner and Curtis Griffin as the two men who entered the store, and further identified petitioner as "the man that killed my uncle." (H 55; 130).

Petitioner was indicted on March 18, 1977 and arrested on March 24, 1977.

At the *Wade* hearing on September 13, 1978, Licatesi testified that he thought the triggerman was in his early thirties (H–45). This statement conflicted with his initial statement given on the night of the murder, that the triggerman was nineteen to twenty-one years old. At trial, Licatesi returned to his initial description of the age of the suspect, *i.e.* nineteen to twenty-one years old.

## Claim One (A)

 Petitioner claims that the absence of defense counsel during the hypnosis session violated his Sixth Amendment right to assistance of counsel. Relying on *U.S. v.*

---

**1.** Parenthetical references are to the trial transcript, except when preceded by "H," signifying that the testimony is from the pretrial suppression hearing.

*Wade,* 388 U.S. 218, 224–225, 87 S.Ct. 1926, 1930–31, 18 L.Ed.2d 1149 (1967), which stated that the Sixth Amendment right to counsel attaches at the first "critical" stage in a criminal prosecution, petitioner advances numerous policy arguments for considering a pre-indictment hypnosis session a "critical" stage for Sixth Amendment purposes. The most significant of these arguments is the substantial risk that neither the hypnotist nor the eyewitness who is hypnotized will detect the suggestiveness of the hypnosis procedure.[2] Even if the court agreed with petitioner, such arguments could not be considered here. *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) clearly holds that a criminal defendant's Sixth Amendment right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

In *U.S. v. Wade,* the Court held that an FBI line-up conducted without informing defense counsel fifteen days after counsel had been appointed to represent the defendant, violated the defendant's Sixth Amendment right to counsel. 388 U.S. at 220, 87 S.Ct. at 1928. In that case, the defendant had been under arrest for more than a month. *Id.* The question in *Wade,* then, was whether in order to preserve the right to a fair trial, an accused represented by counsel has the right to have his lawyer present at a line-up. The Court balanced the potential prejudice to the defendant's rights and the ability of counsel to help avoid that prejudice and concluded that the potential for improper influence required that an accused's counsel be present. *Id.* at 232, 87 S.Ct. at 1935.

If there were any doubts about the limits of *U.S. v. Wade,* the Supreme Court put them to rest in *Kirby v. Illinois,* where the defendant was indicted for robbery six weeks after a show-up[3] and counsel was not appointed for him until his arraignment. "In this case", said the Court, "we are asked to import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings. We decline to do so." 406 U.S. 690, 92 S.Ct. at 1882–83. That teaching is precisely applicable here where the hypnosis session took place prior to the initiation of any adversary judicial criminal proceeding. The robbery and murder for which petitioner was convicted took place on November 13, 1976. On February 1, 1977, the police department conducted the hypnosis challenged in this petition. More than one month later, on March 18, 1977, petitioner was indicted and on March 24, 1977, arrested. At the time of the hypnosis session, petitioner did not have a lawyer and had no right to a lawyer because he was not yet the accused and did not need protection from the "prosecutorial force of organized society." 406 U.S. at 689, 92 S.Ct. at 1882. To the extent that the Supreme Court recognized the possibility that Sixth Amendment rights could be implicated in a criminal investigation prior to the adversarial stage, it did so with reference to other forms of pretrial *confrontation.* Justice Stewart, writing for the Court in *Kirby v. Illinois,* concluded:

> What has been said is not to suggest that there may not be occasions during the course of a criminal investigation when the police do abuse identification procedures. Such abuses are not beyond the reach of the Constitution. As the Court pointed out in *Wade* itself, it is always necessary to "scrutinize *any* pretrial confrontation".... Thus, *Wade* and *Kirby* both limit themselves to pre-trial identification procedures that involve confronting a suspect or an accused. The Due Process Clause of the Fifth and Four-

---

2. The court will not address petitioner's arguments based on *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983) and *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), as neither of these cases rely on the federal constitution.

3. A "show up" differs from a line-up in that a witness is brought to the police station and presented with one individual who is identified. In this case, the witness identified the defendant hours after he was arrested as the man who robbed him. *Id.* 406 U.S. at 684, 92 S.Ct. at 1879.

teenth Amendments forbids a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199]; ... When a person has not been formally charged with a criminal offense, *Stovall* strikes the appropriate constitutional balance between the right of a suspect to be protected from prejudicial procedures and the interest of society in the prompt and purposeful investigation of an unsolved crime. (emphasis in original) 406 U.S., at 690–91, 92 S.Ct., at 1883.

It is clear that such abuse as may have been contemplated is one that would involve an identification procedure in which the *suspect* or the *accused* was confronted.

One year after deciding *Kirby*, the Court held that the Sixth Amendment does not entitle an accused to the right to have counsel present when the government conducts a post-indictment photo display containing a picture of the accused for the purpose of permitting a witness to make an identification. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). The underlying rationale, although conveyed in the opinion of the Court was perhaps more felicitously stated in the concurring opinion of Justice Stewart, at p. 325, 93 S.Ct. at p. 2581:

> While these procedures can be improperly conducted, the possibility of irretrievable prejudice is remote, since any unfairness that does occur can usually be flushed out at trial through cross-examination of the prosecution witnesses. The presence of defense counsel at such pretrial preparatory sessions is neither appropriate nor necessary under our adversary system of justice "to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself."

In the present case, the hypnosis session took place a month prior to the photo identification procedure and well before any adversary judicial criminal proceeding. It also involved a procedure significantly different from a pretrial confrontation. Moreover, whether or not petitioner's policy arguments might have merit in some cases, here there is no evidence to support petitioner's claim of undue suggestiveness. Indeed, Licatesi's pre-hypnosis and post-hypnosis descriptions of the triggerman were virtually identical, indicating that the hypnosis procedure made no difference at all. Accordingly, even if it were inclined to do so, the court would not raise an exception to the *Kirby* rule in this case. Thus, petitioner's claim One (A) is denied with prejudice.

Claim One (B)

■ Petitioner contends that hypnosis supplemented Licatesi's memory with "hypno-memory," investing him with an absolute subjective belief in his memory which effectively deprived petitioner of the opportunity to cross-examine him. Petitioner claims that this violated his Sixth Amendment right to be confronted with the witnesses against him and to the effective assistance of counsel.

It is "the general view of federal courts that prior use of hypnosis on a witness goes to the weight to be given his testimony rather than its admissibility." *Harker v. State of Maryland*, 800 F.2d 437, 442 (4th Cir.1986). Federal courts are also generally in agreement that the testimony of such a witness does not violate the defendant's Sixth Amendment right to confrontation where, as here, both the witness and the hypnotist are available for cross-examination. *See, e.g., Clay v. Vose*, 771 F.2d 1, 4 (1st Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986); *Chaussard v. Fulcomer*, 816 F.2d 925, 929–931 (3rd Cir.1987), *cert. denied*, 484 U.S. 845, 108 S.Ct. 139, 98 L.Ed.2d 96 (1988); *McQueen v. Garrison*, 814 F.2d 951, 961–62 (4th Cir.1987), *cert. denied*, 484 U.S. 944, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987).

The cases, federal and state, in which the effect of hypnosis on testimony is discussed, are numerous as is the law review literature on the subject. Those discussions center around three characteristics of hypnosis as they may affect testimony

which are succinctly stated in *Rock v. Arkansas*, 483 U.S. 44, 59–60, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987) as follows:

[t]he subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and the subject experiences "memory hardening" which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

There is an inherent danger in judges turning psychologists "to probe the subconscious minds of witnesses." *United States v. Wade*, 388 U.S. 218, 248, 87 S.Ct. 1926, 1943, 18 L.Ed.2d 1149 (1967) (Black, J.). There is arguably less danger in judges applying constitutional principles to a record which they are trained and accustomed to analyze and in doing so, discharging their principal task of determining, in a case such as this, whether hypnosis could have affected the witness' ability to testify and respond freely to cross-examination. *McQueen, supra,* at p. 961. An analysis of this record fails to reveal the scintilla of a hint of either suggestibility, confabulation or memory hardening. On the contrary, at the time of the shooting the witness (Licatesi) stated that the triggerman was nineteen to twenty-one years old. At the *Wade* hearing, which was held after the hypnosis session, he stated that the triggerman was in his early thirties. At trial, he testified that the triggerman was in his early twenties. These discrepancies surely belie "memory hardening" and serve to support the Court's observation in *Rock* that "The popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation and, in fact, hypnosis often has no effect at all on memory." 483 U.S. at 59, 87 S.Ct. at 2713. *McQueen v. Garrison, supra,* is particularly relevant in this regard. The Court there concluded that the admission of post-hypnosis testimony did not violate the defendant's Sixth Amendment right because, in assessing the testimony of the witness, the Court noted that her responses were not automatic and did not reflect a preconditioned mental process but rather that her fluctuations and lack of certainty portrayed "a witness in possession of her critical faculties. There is no indication of a memory unshakably frozen by hypnosis." 814 F.2d at 961.

In this regard, an insightful observation by the Court in *Harker v. State of Maryland, supra,* at pp. 442–43 is worth noting:

The Supreme Court has never suggested that memory hardening, a danger in all identification, poses a *per se* violation of the sixth amendment right.... If that were the case, a vast amount of critical eye witness testimony would *ipso facto* be excluded. The answer lies in apprising the jury of the uses and dangers of hypnosis, in permitting full exploration of the hypnotic event, and in cross-examining the subject on the opportunity for pre-hypnotic observation. These steps were taken in this case and *Harker* accordingly suffered no violation of his sixth amendment right to confrontation.

Those same steps were taken or could have been taken in this case and the petitioner similarly suffered no violation of his Sixth Amendment right.

Two years later, the Supreme Court in *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) addressed the question whether the defendant's right to cross-examine a witness whose memory loss rendered him incapable of explaining the basis for his out-of-court identification was so adversely affected as to violate the Confrontation Clause. In answering the question in the negative, the Court said, 108 S.Ct. at pp. 842–43:

The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

\* \* \* \* \* \*

148

The Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish."

\* \* \* \* \* \*

It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even ... the very fact that he has a bad memory.

\* \* \* \* \* \*

The weapons available to impugn the witness's statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.

\* \* \* \* \* \*

There does not appear in our opinions, and we decline to adopt today, the principle that, because of the mere possibility of suggestive procedures, out-of-court statements of identification are inherently less reliable than other out-of-court statements.

At the risk of redundancy, the defendant had every opportunity for effective cross-examination and suffered no deprivation of a constitutional right. Indeed, the witness was cross-examined about the descriptions of the defendant he gave before and after the hypnosis. The jury was informed of the hypnosis and tapes of the hypnosis session were in evidence thus permitting the jury to assess the witness' credibility. The record also reflects that the pre and post-hypnosis descriptions were not significantly different. The persons who conducted the hypnosis of the witness were available had the defendant desired to call them. The defendant was not prevented from calling expert witnesses on the subject of hypnosis had he desired to do so, nor did he request the court to give any special instruction to the jury. In sum, the

defendant's Sixth Amendment right of confrontation was not violated and his claim that it was is rejected, with prejudice.

Claim Two

Petitioner argues that the allegedly suggestive hypnosis procedure impermissibly tainted the subsequent photo-identification, which should have been suppressed. Petitioner does not allege that the photo-identification itself was suggestive.[4]

As previously discussed, the hypnosis procedure had virtually no impact on Licatesi's description of the triggerman, and so was not suggestive. Therefore, it could not have tainted the photo-identification. Accordingly, petitioner's second claim is denied with prejudice.

Conclusion

The petition for a writ of habeas corpus is denied in its entirety, with prejudice.

SO ORDERED.

---

**4.** It is therefore unnecessary to apply constitutional guidelines for determining the reliability of suggestive identification procedures. *See Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).